## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 30 2019, 8:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Benjamin J. Church
Church Law Office
Monticello, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Patricia McMath
Lauren A. Jacobsen
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of K.B.;

J.B.,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

January 30, 2019

Court of Appeals Case No. 18A-JT-1509

Appeal from the White Circuit Court

The Honorable Robert W. Thacker, Judge

Trial Court Cause No. 91C01-1712-JT-27

**Pyle, Judge.**

# Statement of the Case

[1] J.B. ("Mother") appeals the termination of the parent-child relationship with her son, K.B. ("K.B."), claiming that there is insufficient evidence to support the termination.[1] Specifically, Mother argues that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that termination of the parent-child relationship is in K.B.'s best interests. Concluding that there is sufficient evidence to support the termination of the parent-child relationship, we affirm the trial court's judgment.

[2] We affirm.

# Issue

> Whether there is sufficient evidence to support the termination of the parent-child relationship.

# Facts

[3] In August 2014, Mother suffered a traumatic brain injury when she was involved in a serious car accident. In March 2016, Mother's two older children were placed in a guardianship with their maternal grandparents. In August 2016, Mother gave birth to K.B., who is the subject of this appeal. The day after K.B.'s birth, DCS received a report that Mother was unable to provide for K.B.'s basic needs, such as "waking him to feed him and measuring formula to

---

[1] K.B.'s father is not known.

the water bottles." (Tr. 7). DCS filed a petition alleging that K.B. was a child in need of services ("CHINS") and placed him in foster care with his maternal grandparents.

[4] The trial court adjudicated K.B. to be a CHINS in October 2016 and ordered Mother to: (1) participate in individual therapy; (2) participate in home-based case management; (3) assist DCS in finding K.B.'s biological father; (4) attend supervised visits with K.B.; (5) participate in random urine drug screens; (6) maintain suitable, safe, and stable housing; and (7) secure and maintain a legal and stable source of income. DCS subsequently referred Mother to both neuropsychological and substance abuse evaluations. When Mother failed to show progress in any of these programs and began to have positive drug screens for methamphetamine, DCS filed a petition to terminate her parental rights in December 2017.

[5] Testimony at the April 2018 termination hearing revealed that Mother had suffered "severe cerebral insults to various parts of the brain" as a result of the automobile accident and, at the time of the hearing, she had "difficulty with organization, difficulty with decision making, [and] difficulty with impulsivity." (Tr. 68). In addition, Mother was unable "to regulate her moods and she c[ould] be sad one minute and in a rage the next." (Tr. 22). Mother needed "to be supervised around [K.B.] to make sure that she [was] not losing her temper or talking about inappropriate sexual things . . . and making good decisions on supervising him and paying attention to him." (Tr. 22).

[6] In addition, the testimony at the hearing revealed that Mother had struggled to maintain stable housing during the pendency of the proceedings. At the time of the hearing, Mother had moved eight times and was living in an apartment. She was behind on her rent and lived with three rabbits, which were free to roam and defecate throughout the apartment. Mother called the rabbits "her girls" and insisted on keeping them even though they caused cleanliness concerns and had resulted in Mother being evicted from previous apartments. (Tr. 100).

[7] Testimony at the hearing further revealed that Mother did not have legal employment. Instead, she engaged in prostitution and explained that she was paid "a bill," which was one-hundred dollars, every time she had one of her "Joes" over to her apartment. (Tr. 115, 121). Mother testified that she did not have intercourse with her "Joes." Rather, according to Mother, she used her hands or her mouth. She testified that she has approximately eight visits a week from "Joes" and that she leaves her door unlocked so they have access to her home. Mother explained that she has to have her "Joes" come to her home because she cannot leave her rabbits. Mother believed that there was nothing about her job that was improper. She stated that she had no sexually transmitted diseases and that she got tested for them "all the time." (Tr. 119).

[8] K.B., who has suffered from asthma since his birth, takes a steroid twice each day and needs a breathing treatment every evening. He also has to attend frequent doctor's appointments. Guardian Ad Litem Rebecca Trent ("GAL Trent") testified that K.B.'s health was "a concern for him being in [Mother's]

care all the time, knowing what doctors he needs to go to, keeping track of a calendar, keeping track of breathing treatments that he needs to have done, being aware of what they are and how to deal with them." (Tr. 137).

[9] White County DCS Family Case Manage Melissa Barrett ("Family Case Manager Barrett") testified that Mother's drug and alcohol use had increased during the pendency of the proceedings. The case manager further shared her concern that Mother had not had a "legal source of income, she [did not] have a lot of desire to do that because she acknowledge[d] that she [made] more money, doing what she [was] doing." (Tr. 22). Family Case Manager Barrett also testified that K.B. had lived with his maternal grandparents for almost two years. According to the case manager, termination of Mother's parental rights was in K.B.'s best interests because Mother was "unable to provide for the safety, stability, well-being and permanency for [K.B.]" (Tr. 23).

[10] In June 2018, the trial court issued a detailed twenty-page order terminating Mother's parental relationship with K.B. Mother now appeals the termination.

# Decision

[11] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In re J.W., Jr.*, 27 N.E.3d 1185, 1187-88 (Ind. Ct. App. 2015), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Id.* at 1188. Termination of the parent-child relationship is proper where a child's

emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[12] Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K. v. Ind. Dep't of Child Servs.,* 989 N.E.2d 1225, 1230 (Ind. 2013).

[13] When reviewing a termination of parental rights, this Court will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.,* 56 N.E.3d 625,

628 (Ind. 2016). We consider only the evidence and any reasonable inferences to be drawn therefrom that support the judgment and give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. *K.T.K.*, 989 N.E.2d at 1229.

[14] Mother's sole argument is that DCS failed to prove by clear and convincing evidence that there is sufficient evidence that the termination was in K.B.'s best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. The trial court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *K.T.K.*, 989 N.E.2d at 1235. A child's need for permanency is a central consideration in determining the child's best interests. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009).

[15] In addition, a parent's historical inability to provide adequate housing, stability, and supervision coupled with a current inability to provide the same will support a finding that the continuation of the parent-child relationship is contrary to the child's best interests. *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). A child's need for permanency is a central consideration in

determining the child's best interests. *G.Y.*, 904 N.E.2d at 1265. Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[16] Here, our review of the evidence reveals that Mother suffered a traumatic brain injury when she was involved in a serious car accident in 2014. When K.B. was born in 2016, Mother was unable to care for his basic needs, and he was placed with his maternal grandparents. At the time of the termination hearing almost two years later, Mother did not have legal employment. Rather, she engaged in prostitution and left the door to her apartment unlocked so that her "Joes" had access to her home. Mother also lacked stable housing at the time of the termination hearing. She was behind on her rent and lived with rabbits, which were free to roam and defecate throughout her apartment. K.B., who has lived with his maternal grandparents since his birth, suffers from asthma and requires daily steroids and breathing treatments. GAL Trent testified that K.B.'s health was a concern for him being placed in Mother's care. In addition, Family Case Manager Barrett testified that termination was in K.B.'s best interests because Mother was "unable to provide for the safety, stability, well-being and permanency for [K.B.]" (Tr. 23). This evidence supports the trial court's conclusion that termination was K.B.'s best interests.

[17] We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232,

1235 (Ind. 1992).  We find no such error here and therefore affirm the trial court.

[18]    Affirmed.

Najam, J., and Altice, J., concur.